IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE APPLICATION FOR
DISCOVERY PURSUANT TO 28
U.S.C. § 1782, *filed by*

WATER STREET CAPITAL, INC.,

　　　Applicant.

CIVIL ACTION NO.
1:25-cv-04695-TWT-RDC

## ORDER

Respondents Hanwha Q Cells USA, Inc.; Hanwha Q Cells Georgia, Inc.; Bongsoo Kim; Eun Sik Kim; and Hyunkwang Cho (collectively, "**Respondents**") have moved to vacate the Court's July 2, 2025 *Ex Parte* Order (the "***Ex Parte* Order**") and quash the accompanying subpoenas issued pursuant to 28 U.S.C. § 1782. (Doc. 24). Meanwhile, Applicant Water Street Capital, Inc. ("**Water Street**") has moved to compel discovery as permitted by the *Ex Parte* Order. (Doc. 28). The parties' respective motions are each **GRANTED IN PART**, on the terms described below.

### I. BACKGROUND

#### *A. Shareholder Dispute*

The underlying dispute here concerns a fight among shareholders of REC Silicon ASA ("**REC Silicon**"), a public company headquartered in Norway and listed on the Oslo stock exchange. (Doc. 1-1 at 8; Doc. 2 ["**Leming Decl.**"] ¶ 8). As relevant, REC Silicon produced polysilicon—an essential component material in solar panels—at a facility located in the State of Washington (the "**Washington Facility**"). (Doc. 1-1 at 8–9, 13;

Leming Decl. ¶ 7).

Water Street, a U.S.-based investment firm, and **Hanwha Group**, a South Korean conglomerate with sustainable-energy holdings, are the two largest shareholders in REC Silicon. (Leming Decl. ¶¶ 9, 12–13). The pertinent backstory will be presented momentarily, but in short, Water Street alleges that Hanwha Group and its subsidiaries engaged in a fraudulent scheme culminating in a "low-ball tender offer" to REC Silicon's shareholders. (Doc. 1-1 at 23). And Water Street believes Respondents may have information relevant to corresponding legal claims.

Respondents include two companies and three individual executives. First, the companies: Hanwha Q Cells USA, Inc. ("**Q Cells USA**") and Hanwha Q Cells Georgia, Inc. ("**Q Cells Georgia**") are Hanwha Group subsidiaries. (Doc. 1-1 at 9; Doc. 24-2 ["**Hong Decl.**"] ¶ 4, 5, 7). Q Cells USA manufactures solar panels in Dalton, Georgia, and Q Cells Georgia—itself a wholly-owned subsidiary of Q Cells USA—does so at a separate facility in Cartersville, Georgia. (Hong Decl. ¶¶ 5–8). As for the individuals: Bongsoo Kim is the CEO of Q Cells USA; meanwhile, Eun Sik Kim and Hyunkwang Cho are the CEO and CFO, respectively, of Q Cells Georgia. (Hong Decl. ¶¶ 5, 7).

REC Silicon's prospects looked good for a period. Between 2021 and 2022, Hanwha Group invested in REC Silicon to become its largest shareholder with a one-third ownership stake. (Doc. 24-1 at 12; Leming Decl. ¶ 17; Doc. 24-3 ["**Bento Decl.**"] ¶¶ 2, 4). REC Silicon announced plans in June 2022 to renovate the Washington Facility and kickstart polysilicon production. (Leming Decl. ¶ 18). Then, in September 2023, REC Silicon entered into a supply agreement (the "**Supply Agreement**") valued between $2–3

billion with Q Cells Georgia, contracting to sell 100 percent of the polysilicon produced at the Washington Facility over the next ten years to Q Cells Georgia. (Leming Decl. ¶ 19; Bento Decl. ¶¶ 6, 9). Q Cells Georgia thus became REC Silicon's sole customer for the next decade. (Doc. 1-1 at 9, 14–15). Looking at things from Hanwha Group's perspective, it had interests on both sides of the Supply Agreement, as it simultaneously owned (indirectly) the polysilicon buyer (Q Cells Georgia), as well as a one-third share in the supplier (REC Silicon).

In early 2024, REC Silicon ran into trouble as it experienced contamination issues at the Washington Facility. (Leming Decl. ¶ 23). And throughout that year, its polysilicon deliveries were delayed multiple times. (Bento Decl. ¶ 12). Separately, in April 2024, Hanwha Group petitioned the U.S. government for a tariff exemption on polysilicon imports, and it obtained preliminary approval in November 2024. (Doc. 1-1 at 9, 17–18; Leming Decl. ¶¶ 25, 30). REC Silicon's circumstances deteriorated quickly afterward.

In December 2024, REC Silicon announced that it would shutter polysilicon production at the Washington Facility because, based on failed quality testing, it could not meet Q Cells Georgia's production demands under the Supply Agreement. (Doc. 1-1 at 18–19; Doc. 24-1 at 14; Leming Decl. ¶¶ 32–33; Bento Decl. ¶¶ 14–16). Then, in early January 2025, Hanwha Group announced a long-term agreement to purchase polysilicon from a foreign manufacturer in Malaysia in order to supply Q Cells Georgia's production demands. (Doc. 1-1 at 19; Leming Decl. ¶ 35). Later that month, Q Cells Georgia and REC Silicon announced they were mutually terminating the Supply Agreement. (Doc. 1-1 at 19; Leming Decl. ¶ 36; Bento Decl. ¶ 17). Not surprisingly, given the loss of its sole customer,

3

REC Silicon's share value dropped—about 90 percent between October 2024 and January 2025. (Leming Decl. ¶ 37).

In April 2025, after final approval of the polysilicon tariff exemption, another Hanwha Group subsidiary, Anchor AS ("**Anchor**"), made a tender offer to purchase the remaining two-thirds stake in REC Silicon (Hanwha Group itself still owned one-third). (Doc. 1-1 at 20; Leming Decl. ¶¶ 39–40). REC Silicon's board of directors, which Water Street alleges was under Hanwha Group control at the time, unanimously recommended that shareholders accept the offer. (Doc. 1-1 at 20; Leming Decl. ¶ 39). But Water Street disagreed, and in May 2025, it circulated an open letter to shareholders advising that the tender offer was too low. (Doc. 1-1 at 22; Leming Decl. ¶ 45). Around the same time, however, REC Silicon announced that it could not meet its cash-flow obligations without additional financial support. (Leming Decl. ¶ 48). So through its subsidiaries, REC Silicon took a $10 million unsecured loan from Hanwha Group while agreeing to alternative-financing restrictions. (Leming Decl. ¶ 48; Bento Decl. ¶ 25).

At an annual meeting in June 2025, just weeks before the tender offer expired, Water Street proposed new directors and a formal court-led investigation into both the company's polysilicon quality issues and the ensuing termination of the Supply Agreement. (Doc. 1-1 at 24; Leming Decl. ¶ 44; Bento Decl. ¶¶ 23–24). Meanwhile, Hanwha Group informed REC Silicon shareholders that a change in the board's composition might cause it to reassess its financial support. (Doc. 27 at 12; Leming Decl. ¶ 49). In any event, by shareholder vote, Water Street's directors were elected and the proposed investigation approved. (Doc. 24-1 at 16; Leming Decl. ¶ 46; Bento Decl. ¶ 27).

The new board quickly initiated an internal investigation into the Supply Agreement termination. (Doc. 24-1 at 17; Bento Decl. ¶ 28; Doc. 24-34 ["**Snellingen Decl.**"] ¶ 15). On July 7, 2025, a day before the tender offer was set to expire, the new board stated that it had not yet found evidence of misconduct, but it still concluded that the tender offer did "not reflect the underlying value" of REC Silicon. (Doc. 24-1 at 17; Doc. 27 at 13; Bento Decl. ¶ 28). Given the company's poor financial health and lack of financing options, however, the new board recommended that the tender offer be accepted. (Doc. 27 at 14). Separately, pursuant to its shareholder-approved proposal, Water Street around the same time requested a formal court-led investigation into the circumstances surrounding the Supply Agreement termination. (Bento Decl. ¶¶ 27–28; Snellingen Decl. ¶¶14–15, 83).

After consummation of the tender offer, Hanwha Group owned 43.94 percent of REC Silicon's shares, combining its existing shares and those acquired by Anchor. (Doc. 27 at 14). Based on these results, under Norwegian law, Anchor was then required to make a mandatory offer for all remaining shares of REC Silicon. (*Id.*). Meanwhile, with its increased voting rights, Hanwha Group proposed another slate of directors to replace those elected at the previous month's meeting. (*Id.*; Doc. 24-1 at 17; Bento Decl. ¶ 31). Water Street says it supported the board turnover, which replaced its own preferred directors, because it was concerned about REC Silicon's financial health. (Doc. 27 at 14). In the following weeks, a Hanwha Group subsidiary provided REC Silicon with an additional $6.5 million loan. (Doc. 27 at 15; Bento Decl. ¶ 32). And on July 31, 2025, Anchor launched its mandatory follow-up tender offer, which expired on August 29, 2025. (Doc. 27 at 15).

5

### B. Procedural History

On June 30, 2025, while the initial tender offer was pending, Water Street filed an *ex parte* application seeking this Court's assistance in obtaining discovery, pursuant to 28 U.S.C. § 1782. (Doc. 1). Water Street wanted to obtain documents and Rule 30(b)(6) deposition testimony from the two corporate Respondents, plus deposition testimony from the three individual Respondents. (Docs. 4-1 to 4-5). In support of its application, Water Street submitted affidavits from Paul Leming, a principal and investment analyst; Morten Kinander, a Norwegian business-law professor; and Reed Brodsky, one of its attorneys. (Docs. 2–4). Water Street also asked the Court to expedite consideration. (Doc. 6).

On July 2, 2025, just two days after filing, the undersigned issued the *Ex Parte* Order granting Water Street's application and permitting it to serve subpoenas on Respondents. (Doc. 13). About two weeks later, with only one subpoena having been served, the parties agreed to hold the *Ex Parte* Order in abeyance pending resolution of Respondents' anticipated challenges to discovery. (Doc. 15). The undersigned adopted the parties' agreement and set a briefing schedule. (Doc. 16).

The parties have now filed their respective papers arguing the propriety of the *Ex Parte* Order. During the briefing exchange, they traded multiple declarations. Respondents submitted two declarations from each of Seung Hwan Hong, Q Cells Georgia's legal counsel, (Docs. 24-2, 29-1); Lucas Bento, Respondents' attorney, (Docs. 24-3, 29-2); and Magnus Snellingen, a Norwegian attorney experienced in corporate and financial litigation, (Docs. 24-34, 29-3). On the other side, Water Street submitted a declaration from David Salant, its attorney, (Doc. 27-1), along with supplemental declarations from Leming

and Kinander, (Docs. 27-8, 27-9).

Before moving on, the undersigned notes that this is not Water Street's only § 1782 proceeding. On June 6, 2025, it filed a related application in the Eastern District of Washington. *In Re: Water Street Capital Inc.*, No. 2:25-mc-00019-JAG (the "**Washington Proceeding**"). There, U.S. Magistrate Judge James A. Goeke granted Water Street's initial *ex parte* application and later granted in part the respondents' motion to quash. *Id.*, ECF Docs. 10, 24.

## II. LEGAL STANDARD

Under § 1782, a district court may order discovery from a person or entity residing in the United States for use in a foreign proceeding. 28 U.S.C. § 1782(a).[1] Although the court's order may prescribe the procedure for taking discovery, if the order does not do so, the discovery is produced "in accordance with the Federal Rules of Civil Procedure." *Id.*

There are two sets of criteria, one statutory and one discretionary, that must be examined before a district court can grant an application under § 1782. First, the statutory elements—these are required:

(1) the application must be made "by a foreign or international tribunal," or by "any

---

[1] Section 1782(a) provides, in relevant part:

The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person . . . . To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).

interested person";

(2)  the application must seek evidence, whether it be the "testimony or statement" of a person or the production of "a document or other thing";

(3)  the evidence must be "for use in a proceeding in a foreign or international tribunal"; and

(4)  the person or entity from whom discovery is sought must reside or be found in the district of the district court ruling on the application.

*In re Clerici*, 481 F.3d 1324, 1331–32 (11th Cir. 2007). If these elements are met, then the district court has authority to assist. *Id.*

Even if the district court has authority to grant an application, however, it need not do so. The matter is discretionary. *Id.* at 1332. To guide the exercise of that discretion, the U.S. Supreme Court has set out the following four factors to consider:

(1)  whether the discovery target is a participant in the foreign proceeding;

(2)  whether the foreign tribunal would be receptive to U.S. federal-court assistance;

(3)  whether the application is an attempt to circumvent foreign proof-gathering restrictions or other policies; and

(4)  whether the discovery request is otherwise unduly intrusive or burdensome.

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264–66 (2004).

### III. DISCUSSION

Respondents have moved to vacate or limit the *Ex Parte* Order on several grounds, which will be explored in more detail below. In short, they contend that Water Street has embarked on a baseless "fishing expedition," and that this Court should reject that effort. After careful review of the parties' submissions, however, the undersigned concludes that assistance is warranted.

Respondents challenge the third statutory factor and all four discretionary factors. The discussion will proceed in that order.

### A. Statutory Elements

The third statutory factor, the only one challenged here, requires that a petitioner demonstrate the requested discovery is "for use in a proceeding in a foreign or international tribunal." *In re Clerici*, 481 F.3d at 1332. Respondents say Water Street cannot make that showing for several reasons—namely, that Water Street has neither filed nor outlined plans to imminently file a foreign proceeding, that it has no viable foreign claims, and finally, that its true aim is to collect evidence on behalf of REC Silicon and/or file an action in the United States, not abroad. The undersigned is not persuaded.

Section 1782 doesn't require an active or imminent proceeding—instead, it is enough if the proceeding is "within reasonable contemplation." *Intel*, 542 U.S. at 259. That said, "subjective intent to undertake some legal action" is, by itself, not enough. *In re Rendon*, No. 1:20-mc-21152, 2020 WL 8771274, at *10 (S.D. Fla. Nov. 5, 2020), *R. & R. adopted*, 519 F. Supp. 3d 1151 (S.D. Fla. 2021). A petitioner's laments coupled with a "twinkle in counsel's eye" will not do. *In re: Gulf Investment Corp.*, No. 19-mc-593, 2020 WL 7043502, at *3 (S.D.N.Y. Nov. 30, 2020). Something more substantial is required. An applicant must present "objective indicium that the action is being contemplated." *In re Rendon*, 2020 WL 8771274, at *10; *see also Application of Furstenberg Fin. SAS v. Litai Assets LLC*, 877 F.3d 1031, 1035 (11th Cir. 2017) (observing that a reviewing court must look for "reliable indications of the likelihood that proceedings will be instituted within a reasonable time"). Notably, when assessing statutory jurisdiction under § 1782, the merits

9

of the petitioner's foreign claims are largely irrelevant. *See In re: Application of Bracha Foundation*, 663 F. App'x 755, 758 (11th Cir. 2016) (observing that the "merits of the underlying commercial dispute" were not before the court when considering a § 1782 application); *Furstenberg Fin. SAS*, 877 F.3d at 1034 n.6 ("[Foreign] [s]ubject matter jurisdiction is intertwined with the merits, which are not before this Court in a § 1782 proceeding.").

Here, Water Street has presented sufficient signs that it is reasonably contemplating a foreign lawsuit. Its theory of the case goes something like this: after foreign polysilicon prices dropped and it obtained a tariff exemption, Hanwha Group—together with Anchor, other affiliates, plus former REC Silicon directors—set out to sabotage REC Silicon's polysilicon production at the Washington Facility, terminate the Supply Agreement with Q Cells Georgia, cause the price of REC Silicon shares to drop, and then take over REC Silicon with a misleading and too heavily discounted tender offer. *See* (Leming Decl. ¶ 5; Doc. 3 ["**Kinander Decl.**"] ¶¶ 3, 7). In the undersigned's estimation, Water Street has presented enough evidence to suggest that it is indeed contemplating a corresponding lawsuit in Norway (the merits of which are irrelevant).

To start, Water Street has presented declarations from Paul Leming, a principal, who states that the company intends to sue Anchor along with former REC Silicon directors in Norway for alleged misrepresentations made in connection with the tender offer, which he believes violated Norwegian disclosure and fiduciary laws. (Leming Decl. ¶¶ 51, 53; Doc. 27-8 ["**Leming Supp. Decl.**"] ¶¶ 8–9). The declaration is not dispositive, but it's a strong start. *See Gulf Investment Corp.*, 2020 WL 7043502, at *3 ("[S]worn

10

statements attesting to petitioners' intent to litigate and describing the legal theories on which they plan to rely are sufficiently concrete to meet the [§ 1782] statutory requirement." (citation omitted)); *In re Hornbeam Corp.*, 722 F. App'x 7, 9–10 (2d Cir. 2018) (holding that a foreign proceeding was reasonably contemplated where the applicant "represented that it intended to initiate further litigation," and "articulated a theory on which it intended to litigate").

Moreover, Leming's stated intent is corroborated by Water Street's recent actions and the legal opinion of Morten Kinander, its Norwegian legal expert. Recall that soon after the tender offer was announced, Water Street (1) circulated an open letter to shareholders explaining that it believed the offer price was too low, (2) proposed a new slate of REC Silicon directors, (3) initiated, through the new directors, an internal investigation of the Supply Agreement termination, (4) formally requested a court-led investigation of the Supply Agreement termination, and (5) filed a § 1782 application in the Washington Proceeding. (Leming Decl. ¶¶ 44–46, 52; Snellingen Decl. ¶¶ 14–15, 83). Water Street also obtained witness statements from seven former employees at REC Silicon's Washington Facility, who attested to Hanwha Group's increasing control over and interference with the location's operations in the lead-up to the Supply Agreement termination. (Doc. 4 ["**Brodsky Decl.**"] ¶¶ 16–24). It is apparent, then, that Water Street not only suspects foul play, but that it has already taken several steps to pursue the matter. Moreover, Kinander has opined that Water Street may plausibly assert claims against Anchor and the former REC Silicon board members for violations of Norway's Securities

Trading Act and Public Limited Liability Companies Act.[2] (Kinander Decl. ¶¶ 3, 9; Doc. 27-9 ["**Kinander Suppl. Decl.**"] ¶¶ 15–24). And in doing so, he has detailed statutory, regulatory, and judicial precedents to support his opinions. (Kinander Decl. ¶¶ 9–47; Kinander Suppl. Decl. ¶¶ 14–24).

Given the foregoing indicia—i.e., declared intent to sue, preliminary actions, evidence of alleged misconduct, and an expert legal opinion articulating theories of liability—Water Street has made out the requisite showing. Respondents' challenges, by contrast, fall short. The undersigned is not troubled by the absence of current or imminent proceedings because, as just explained, there is reason to believe that such proceedings are being reasonably contemplated. Respondents say that Water Street's legal claims are not viable, but the Court cannot be expected to resolve substantive questions of foreign law. *See Bracha Foundation*, 663 F. App'x at 758; *Furstenberg Fin. SAS*, 877 F.3d at 1034 n.6. Again, the only question currently at issue is whether there is a reasonable likelihood of upcoming foreign litigation, *not* who might prevail. *See In re Jagodzinski*, No. 18-20606, 2019 WL 1112389, at *5 (S.D. Fla. Jan. 15, 2019) (explaining that the "potential success" of the § 1782 applicant's foreign claims should not be conflated with the statutory requirements), *R. & R. adopted*, 2019 WL 2255564 (S.D. Fla. Apr. 8, 2019). Finally, Respondents believe that Water Street's application is disingenuous, as it could simply be

---

[2] Kinander has stated that Water Street has a plausible claim against Anchor for an injunction halting the tender offer. (Kinander Decl. ¶¶ 37–47). But evidence shows that, at this point, the initial tender offer has already been made and accepted. (Leming Suppl. Decl. ¶¶ 4–5). In any event, Kinander states that Water Street may have additional, non-injunctive claims. (Kinander Supp. Decl. ¶¶ 15–24).

12

planning to forward information along to REC Silicon and/or use the information to bring a lawsuit in the U.S. rather than Norway. Those scenarios are possible. But Respondents have not shown that they are the main reason Water Street filed its application. There is, in the undersigned's estimation, no indication of bad-faith gamesmanship.[3]

For these reasons, Water Street has satisfied the third and only contested statutory element, and this Court thus has jurisdiction over its § 1782 application.

### B. Discretionary Factors

Turning to the four discretionary *Intel* factors, Respondents say none support Water Street's application. Here, in short, are their arguments.

First, even though they may not be parties to the anticipated litigation in Norway, Respondents contend that Water Street can legally obtain "most of the requested discovery in Norway" without the Court's assistance. (Doc. 24-1 at 27). In other words, exercising jurisdiction over Anchor and the former REC Silicon directors (i.e., the parties that Water Street says it plans to sue), Norwegian courts could compel production of the information Water Street seeks. So this Court's help isn't necessary. Second, Respondents argue that Norwegian courts will not be receptive to the requested §1782 discovery because they maintain—as alluded to earlier—that Water Street has no viable claims under Norwegian

---

[3] Citing a July 2024 press release, Respondents argue that Water Street's ultimate intent is to sue Hanwha Group in the U.S. (Doc. 24-1 at 25; Doc. 24-30). The press release does not suggest as much. First of all, the press release concerns a financing agreement between REC Silicon and Anchor—*not* the Supply Agreement between REC Silicon and Q Cells Georgia, which is the focus of the inquiry here. And second, the press release was issued when Water Street still controlled the REC Silicon board—which, presumably, could have initiated legal action on behalf of REC Silicon against Anchor under the financing agreement— but as described above, that circumstance subsequently changed back into Hanwha Group's favor.

law. Third, Respondents say this Court should deny assistance because Water Street's deposition requests are just an attempt to run around "Norwegian law's prohibitions on the taking and use of deposition testimony." (*Id.* at 30). Finally, Respondents insist that Water Street's requested discovery is unduly burdensome, for several reasons—the requests are too broad and seek privileged information, some requests are duplicative of requests made in the Washington Proceeding, and the individual Respondents are executives who should be shielded by the so-called "apex doctrine." As noted, Respondents have submitted multiple declarations—including one from Magnus Snellingen, a Norwegian lawyer—in support of their motion.

Having carefully reviewed the parties' submissions and competing declarations, the undersigned finds that the balance of *Intel* factors favors this Court's assistance under § 1782. That said, the parties themselves have more work to do before the scope of that assistance can be finalized. The *Intel* factors will be discussed in turn, culminating with instructions on next steps.

### i. First Discretionary Factor

The first *Intel* factor considers "whether the person from whom discovery is sought is a participant in the foreign proceeding." *Intel Corp.*, 542 U.S. at 264. The reason is straightforward—"[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Id.* In such cases, the need for U.S. judicial assistance is less obvious. To date, there is no foreign proceeding here. But as relevant, Water Street has presented evidence that it intends to sue Anchor and former REC Silicon directors in Norway—*not* Respondents. Crediting that affirmation (Respondents have not

presented reasons to do otherwise), the first *Intel* factor favors assistance.

It may be the case, as Respondents have suggested, that Water Street could obtain *some* of its requested discovery through the Norwegian courts, as Respondents are affiliated under the Hanwha Group corporate umbrella with Anchor and the former REC Silicon directors. But there are some important caveats. To start, Respondents do not suggest that Water Street could obtain *all* of its requested discovery through the Norwegian courts. Just some. Next, "the fact that a U.S. affiliate may have some of the same documents as its foreign affiliate in the foreign litigation does not weigh against granting the requested discovery." *In re Pidwell*, No. 1:21-mc-0166, 2022 WL 192987, at *5 (S.D.N.Y. Jan. 21, 2022); *see also Bracha Foundation*, 663 F. App'x at 765 (upholding § 1782 discovery where "some records" might be obtained in the foreign proceeding because the sought-after evidence was "not clearly duplicitous" with documents available abroad). And here, despite their affiliation with Respondents, it is not at all clear how much of the requested discovery could be obtained directly from or through the prospective defendants in Norway.

This not a case where the applicant is, "for all intents and purposes," seeking discovery from an actual or prospective adversary. *Frasers Grp. PLC v. Stanley*, 95 F.4th 54, 59 (2d Cir. 2024). Instead, the Hanwha Group's corporate family tree appears to be highly reticulated, yet Respondents haven't presented enough details to confirm that the Norwegian courts could jurisdictionally navigate it to compel the relevant discovery. Finally, according to Water Street's legal expert, Norwegian courts lack the authority to compel testimony or document production from U.S. residents like Respondents.

(Kinander Supp. Decl. ¶¶ 26–30). Respondents counter with their own expert declaration, insisting that Norwegian courts can seek U.S.-court assistance directly under the Hague Convention. (Snellingen Decl. ¶ 48; Doc. 29-3 ["**Snellingen Supp. Decl.**"] ¶¶ 23–24, 40). True, but that process can be "extremely bureaucratic and time-consuming." *In re Genial Institucional Corretora de Cambio, Titulos e Valores Mobiliarios S.A.*, No. 24-mc-348, 2025 WL 40783, at *3 (S.D.N.Y. Jan. 7, 2025). The undersigned thus finds that such alternative procedures—arguable but impractical—are not dispositive of the first *Intel* factor, at least in this case.

In short, because Respondents will not be parties to the prospective litigation in Norway, some (at a minimum) of the sought-after discovery may not be obtainable through Norwegian corporate affiliates, and Norwegian courts lack jurisdiction over U.S. residents like Respondents, the first *Intel* factor favors assistance.

### ii. Second Discretionary Factor

The second *Intel* factor concerns the foreign tribunal's receptivity to U.S. court assistance. *Intel Corp.*, 542 U.S. at 264. Courts are reluctant to act in vain; futility of effort generally counsels against its exercise. Respondents say that Norwegian courts would reject the sought-after evidence because Water Street has no viable claims and, moreover, Norwegian courts generally disallow recorded witness statements. However, the undersigned finds that Norwegian courts may indeed be receptive to § 1782 discovery, so the second factor supports assistance.

As a sister court has observed, the second *Intel* factor does not obligate courts to "engage in 'speculative forays' into 'unfamiliar' legal territories to determine the likely

16

reaction of a [foreign] court to any Section 1782 discovery." *In re Jagodzinski*, 2019 WL 1112389, at *6 (citation omitted). U.S. federal courts cannot be expected to know the ins and outs of foreign law, whether it relates, for example, to corporations or evidence. The relevant inquiry, then, generally boils down to whether there is "authoritative proof that a foreign tribunal would *reject* evidence obtained with the aid of § 1782." *Id.* (emphasis in original, citation omitted). Here, there is no such proof. Rather, the parties have submitted competing declarations by Norwegian legal experts. Water Street's expert says Norwegian courts would accept the evidence at issue because the Respondents cannot be compelled to appear and "Norwegian law permits all evidence that meets criteria of relevance, proportionality, and reliability." (Kinander Supp. Decl. ¶¶ 4–11, 31–38). Respondents' expert disagrees, particularly with respect to the sought-after depositions. (Snellingen Decl. ¶¶ 54–57, 86). Together, this evidence does not resolve the issue but merely underscores the dispute, a dispute about foreign evidentiary rules that this Court has no duty or competence to answer definitively. *See In re Furstenberg Fin. SAS*, 785 F. App'x 882, 885 (2d Cir. 2019) ("[A] battle-by-affidavit of international legal experts that turns on a prediction of the procedural or substantive law of the foreign jurisdiction . . . is beyond the scope of a Section 1782 inquiry." (cleaned up)).

Without authoritative proof that the sought-after evidence would be rejected in the anticipated Norwegian litigation, the second *Intel* factor also favors assistance. *See In re Jagodzinksi*, 2019 WL 1112389, at *6 (observing that without authoritative proof that a foreign court would reject the sought-after evidence, "a district court's ruling should be informed by Section 1782's overarching interest in providing equitable and efficacious

procedures for the benefit of tribunals and litigants involved in litigation with international aspects").

### iii. Third Discretionary Factor

The third *Intel* factor considers "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel Corp.*, 542 U.S. at 265; *see also In re Clerici*, 481 F.3d at 1334. As alluded to, Respondents argue that at least with respect to the sought-after depositions, Water Street is attempting to work around the Norwegian rules of evidence. The undersigned is not persuaded—on balance, this factor also supports assistance.

The parties' legal experts seem to agree that Norwegian courts prefer live in-person testimony, but they disagree about when recorded witness statements (e.g., transcribed deposition testimony) may nevertheless be used. Water Street's expert says that Norwegian law allows for witness statements when live in-court examination would be "impossible," which includes situations like the present one where "witnesses are outside Norway and cannot be compelled to appear." In his opinion, Norwegian courts take a practical approach to admissibility. (Kinander Supp. Decl. ¶¶ 4–11, 31–38). Respondents' expert disagrees. He maintains that Norwegian courts take a strict approach to recorded testimony, with the impossibility exception limited to "extraordinary circumstances" such as when, for example, a witness resides in a country that has no cooperative arrangement with Norway. And that scenario is inapposite here, in his opinion, because Norwegian courts regularly seek assistance from U.S. authorities. (Snellingen Supp. Decl. ¶¶ 6, 10–11). What we have here is an interpretive dispute between foreign legal experts—as noted with the prior *Intel*

18

factor, this Court is in no position to resolve it. *See In re Furstenberg Fin. SAS*, 785 F. App'x at 885; *accord Deposit Insurance Agency v. Leontiev*, No. 17-mc-00414, 2018 WL 3536083, at *8 (S.D.N.Y. Jul. 23, 2018) ("Section 1782 does not require that the discovery materials necessarily be admissible or discoverable in the foreign proceeding."). Though there is disagreement, Water Street has presented enough evidence to suggest that recorded depositions may be used in Norwegian proceedings, so this factor also weighs in its favor.

Before moving on, Respondents suggest that Water Street is acting in bad faith, as it filed its application *before* initiating suit in Norway. Rather than pursuing discovery in the ordinary course *after* filing its action, Respondents argue, Water Street has instead "jumped the gun" by asking for this Court's assistance beforehand. There is, however, no § 1782 exhaustion requirement. In other words, "even when the requested documents may be available in the foreign jurisdiction, there is no requirement to first seek discovery from the non-US tribunal or exhaust other options before applying to a district court for § 1782 discovery." *Bracha Foundation*, 663 F. App'x at 765. The undersigned has discerned no indication that Water Street is seeking to circumvent Norwegian law or is otherwise acting in bad faith. Water Street believes Respondents may have information to support its suspicion of misconduct, and although Norwegian courts prefer live witness testimony, there is a genuine legal dispute about the admissibility of recorded witness statements. To repeat, then, the third factor supports judicial assistance.

### iv. Fourth Discretionary Factor

The fourth and final *Intel* factor considers whether the § 1782 discovery request is otherwise "unduly intrusive or burdensome." *Intel Corp.*, 542 U.S. at 265; *see also In re*

*Clerici*, 481 F.3d at 1334. Having decided under the first three factors that this Court's assistance is appropriate with respect to at least *some* discovery, the question now is how much? This is where the parties have more work to do.

Water Street wants to obtain documents and Rule 30(b)(6) deposition testimony from the two corporate Respondents, plus deposition testimony from the three individual Respondents. In the *Ex Parte* Order, the undersigned previously granted Water Street leave under § 1782 to pursue its sought-after evidence. On a fuller record and with the benefit of Respondents' arguments, however, the undersigned concludes that some trimming may be appropriate. The parties are thus **ORDERED** to meet and confer in person or by teleconference to negotiate (1) the scope of Water Street's discovery requests, and (2) a mutually agreeable protective order.

To aid the parties in their upcoming negotiation, the undersigned notes the following:

First, the evidence adduced thus far suggests that Q Cells Georgia and its executives, Eun Sik Kim and Hyunkwang Cho, may have information relevant to Water Street's prospective claims regarding the termination of the Supply Agreement. Q Cells Georgia, after all, was a party to the Supply Agreement. And Kim and Cho were its CEO and CFO, respectively, who may reasonably be presumed to have personal knowledge concerning the Supply Agreement's termination. The undersigned notes that even if the apex doctrine applies to Kim and Cho, as Respondents urge, there is reason to believe that, given their positions, they have unique or superior knowledge concerning their company's termination of a multi-billion dollar contract with REC Silicon. Given the significance of that decision,

few individuals at the company are likely to have personal knowledge of the surrounding circumstances, and Respondents have identified no other suitable lower-ranking employees. On the other hand, Q Cells USA was not a party to the Supply Agreement, so it is much less clear whether it or Bongsoo Kim, its CEO, have any relevant information.

Second, Water Street's discovery requests appear to be reasonably time limited, covering the period from June 1, 2024 through January 10, 2025. Even so, the document requests may be overbroad in scope, as they seek "All Documents and Communications Concerning the [Supply] Agreement." (Docs. 4-1, 4-2). Water Street should try to narrow down the scope of these requests—whether, for example, by custodian, document type, or additional search terms—and also avoid redundancy, if any, with discovery already obtained in the Washington Proceeding. As for privileged material, Section 1782 expressly preserves legally applicable privileges,[4] so the undersigned is confident that any related concerns can be addressed in the ordinary course through withholding and logging.

Third, the undersigned sees no good reason to impose a prosecution bar or award reciprocal discovery, as Respondents have urged. The parties are free to negotiate either measure. But Respondents have not shown why such measures would be appropriate here. They suggest Water Street may wish to use evidence obtained through its § 1782 application for use in future U.S. litigation. That may be true, but "restrictions on subsequent use of evidence obtained under § 1782 urged here . . . are simply not supported

---

[4] Section 1782 provides the following: "A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." 28 U.S.C. § 1782.

21

by statutory text, legislative history, conventional discovery practice, or policy considerations." *Glock v. Glock, Inc.*, 797 F.3d 1002, 1010 (11th Cir. 2015); *accord Deposit Insurance Agency*, 2018 WL 3536083, at *4 (observing that "§ 1782 does not regulate what litigants may do with discovery after it lawfully has been obtained" (quotation and citation omitted)). Again, the undersigned has detected no indication of subterfuge. But if Respondents later uncover evidence that Water Street has abused the § 1782 process, they may seek protection from the U.S. court where any subsequent litigation is commenced. *See Glock*, 797 F.3d at 1009 (explaining that a U.S. court may choose to exclude evidence that it believes was obtained improperly under § 1782).

As for reciprocal discovery, such a measure is generally warranted only when the § 1782 application seeks discovery from an adversary. That is not the case here. As explained, Respondents are not the prospective defendants in the anticipated Norwegian litigation. The utility of reciprocal discovery here thus appears dubious. *See Deposit Insurance Agency*, 2018 WL 3536083, at *11 (denying the § 1782 respondent's request for reciprocal discovery because he was not a party to the foreign proceeding and it was thus "unclear what purpose reciprocal discovery would serve, other than as a prophylactic against a wide range of hypothetical actions against him").

In sum, the Court will assist Water Street's discovery efforts under § 1782. But the parties must first make a good-faith attempt to refine the scope of discovery.

## IV. CONCLUSION

For the reasons stated, the undersigned finds, first, that this Court has statutory jurisdiction over Water Street's § 1782 application; and second, that the *Intel* factors favor

judicial assistance. However, the parties must attempt to negotiate the scope of that assistance. Respondents' motion to vacate and quash, (Doc. 24), and Water Street's corresponding motion to compel, (Doc. 28), are each **GRANTED IN PART** as follows:

1. No later than **DECEMBER 15, 2025**, the parties must meet in person or by teleconference to discuss in good faith the scope of discovery consistent with the discussion above; and

2. No later than **DECEMBER 19, 2025**, the parties must submit (i) a proposed protective order for the Court's approval, and (ii) a joint statement that establishes a schedule for document production and depositions, and that identifies any unresolved discovery issues. If unresolved issues remain, the joint statement must specifically identify the disputed discovery issue(s) along with the parties' respective arguments, and the joint statement must not exceed four double-spaced pages per issue (for example, if there are three discrete issues, the joint statement must not exceed twelve pages).

IT IS SO **ORDERED** on this 8th day of December 2025.

REGINA D. CANNON
United States Magistrate Judge

23